Annie Fuhry, Appellee, v. Chicago City Railway Company, Appellant.

## Gen. No. 13,960.

1. NEGLIGENCE—*what establishes prima facie case.* Proof of status as a passenger and an injury resulting from a collision establishes negligence *prima facie* against the carrier and casts upon it the burden of showing that the collision occurred under such circumstances as to exclude its liability; *held*, that the evidence of the carrier as to the "slippery, greasy and muddy condition of the track" did not justify its exoneration from responsibility.

2. EVIDENCE—*how rate of speed may be shown.* The rate of speed at which a car was traveling at or about the time of an accident may be shown by the approximation of witnesses qualified from observation.

3. EVIDENCE—*what, of attending physician, competent.* The tes-

timony of an attending physician as to the physical condition of the plaintiff in an action for personal injuries based upon what he observed and ascertained by the application of tests, is not incompetent by reason of the conclusion being given in part upon the statements of the plaintiff.

4. EVIDENCE—*appropriate form of hypothetical question as to causes of physical condition.* A physical condition *prima facie* established it should be inquired not as to what might have produced it but as to what did produce the condition disclosed.

5. VERDICT—*when not excessive.* A verdict of $2,500 rendered in an action for personal injuries is not excessive where it appears that before the accident the plaintiff was a strong, healthy, hard-working woman, earning nine to ten dollars per week by washing, that after the accident she became practically an invalid, and that no favorable prospect of recovery from the injuries sustained appears.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. RICHARD W. CLIFFORD, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed November 12, 1908.

WILLIAM J. HYNES, JOHN E. KEHOE and WATSON J. FERRY, for appellant.

JOHN S. HUMMER and CHARLES A. McDONALD, for appellee.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

The appellant is a street railway company, and operates street railway cars by electric power in South Halsted street, a street lying north and south in the city of Chicago. Between seven and eight o'clock in the morning of May 7, 1903, Annie Fuhry, the plaintiff, became a passenger at Thirty-third and Wallace streets on one of appellant's cars, to be carried south to Forty-seventh street, an east and west street. As the car in which she was riding was approaching Forty-third street, a Mrs. Flynn, who was a passenger on the car, signaled the conductor to stop the car. The conductor gave the signal to stop, and the car slowed and stopped on the south side of Forty-third

street to permit Mrs. Flynn to alight; but before she could do so another of appellant's cars, which was running south in the same track as the car in which plaintiff was riding, and behind that car, crashed into the rear end of that car. The evidence tends to prove that the car in which the plaintiff was riding, and which had stopped, as stated, on the south side of Forty-third street, was driven forward by the force of the collision between fifty and one hundred feet, and that the head of the motorman of the rear car was driven through the front window of his car. The plaintiff at the time of the accident was sitting on the east side of the car, at its rear end, near the rear door. The conductor of the car testified that he saw the plaintiff immediately after the collision lying on the floor unconscious and her face bleeding, and that, with the assistance of another person, he carried her into a shoe store, called a doctor to attend her, and then returned to his car. The evidence tends to prove that the plaintiff was seriously injured. It was nearly eight o'clock A. M. when the collision occurred, and it was proved and admitted on the trial that the day was bright and sunshiny. Anthony Vogt, one of appellant's conductors, testified that he was riding on the front platform of the rear car, and that he saw the car on which plaintiff was stop on the south side of Forty-third street, and that then the front end of the car on which he was riding was about opposite the second door north of Forty-third street and about seventy-five to one hundred feet from the car with which it subsequently collided, and was running at the rate of from eight to ten miles per hour. The evidence for the plaintiff makes a *prima facie* case for her, casting on the defendant the burden of showing that the collision occurred under such circumstances as to exclude its liability. North Chicago St. Ry. Co. v. Cotton, 140 Ill. 486; W. Chicago St. R. R. Co. v. Martin, 154 *ib.* 523, 529, and cases cited.

Appellant's counsel contend that the collision was

caused by the "slippery, greasy and muddy condition of the track", for which the defendant was in no wise responsible, and which "could not have been discovered by any management, however skillful".

Vogt, called by defendant, testified that there was mud on the rail, caused by wagons passing over it, and that the rail was sweaty and the day damp and the rail was as slick as glass, and when the motorman shut off the power and applied the brake, about seventy-five feet from the car which had stopped, the brake had no effect, and the car kept sliding. This witness, on being asked to explain how the condition of the track testified to by him would prevent the wheels from taking hold, answered: "That is owing to the condition of the weather. Some mornings the weather will be fine and the next morning the sun won't come out, you know, until late, and it will come and kind of—I don't know what, kind of an atmosphere, kind of dampness, and wagons going over it will make a kind of mud form on it; when this mud is formed on it cars keep continually going over it without stopping, and the mud will become like glass, and the next man comes along and he tries to make a stop there and applies sand, but the sand won't hold, the wheels will lock and gradually push the sand off, and you can't stop sometimes with a block".

First, as to the weather: It was admitted on the trial by defendant's counsel, after being proved, that the 6th and 7th days of May, 1903, were bright and sunshiny, and that the night between those days was a clear moonlight night. Second, as to the alleged muddy condition of the track: C. A. Halsted, a motorman in defendant's employ, but not operator of either of the cars in question, called by defendant, testified in chief: "I was familiar with the tracks of the Chicago City Railway Company on Halsted street and Forty-third as they existed in 1903; that was a level street along there; the rails of the track were about level with the street; the wagon traffic on that street

at that point is pretty heavy; it is right in front of the Union Stock Yards; the traffic at that time was merely store and meat wagons. Those wagons drove in the tracks of the street car company and crossed them''. On cross he testified: ''I say there was considerable traffic on the street at that crossing, and that was stock yards traffic. The way that would affect the rail there is in droppings from the wagons, and carrying dirt into the tracks from the outside''. This witness further testified: ''As a motorman I know that those slippery conditions are apt to be along the track and met with any time. We are usually on guard more or less to avoid collisions, in case of a slippery rail; I mean we are watching, taking observations of every thing around. We run slower and farther apart''.

John R. Shirley, a conductor in defendant's employ, called by defendant, testified that the track at the crossing of Halsted and Forty-third streets was slippery; that the motorman on the rear car was an extra man, and that, even if the condition of the track at the crossing, at the time in question was permanent, it would be impossible for him to remember it. He says an extra man is one who works on various lines, one today, another tomorrow, and perhaps still another the next day, and is not as familiar with any particular track as is the motorman running constantly over it. Shirley further testified that the rail was what he called a greasy rail, and came from sweating. Asked what would remove the condition produced by sweating, he said, ''The effect of the sun; you see if the sun was shining it would dry it up;'' and that he was not sufficiently versed in the matter to answer as to how long it would take to dry it up.

The rear car, which was being operated by an extra motorman, was following the car in which the plaintiff was riding as the latter car was approaching the intersection of Halsted and Forty-third streets, and he was bound to consider that the car in front of him might stop

on the south side of the intersection, in case any passenger wanted to alight from or board it; that it was the duty of those operating it to so stop it, in the event of any one desiring to get on or off it, and it seems clear that it was his duty to keep such a distance behind it as to be able to stop his car in time to prevent a collision, even though his car should run onto a slippery rail, which defendant's witnesses say is liable to happen anywhere along the line, and in respect to which Halsted says, "We are usually on guard more or less to avoid collisions in case of a slippery rail."

In the present case the rear car was moving at the rate of 8 to 10 miles per hour, and when the motorman of the rear car attempted to stop it, it was only, as Vogt testified, about 75 feet from the car with which it collided.

The verdict of the jury in favor of the plaintiff necessarily includes the finding that the collision has not been so explained as to exonerate the defendant from liability. We think the verdict sustained by the evidence.

Defendant's counsel object to certain rulings of the trial court on evidence, and also claim that the damages are excessive. The ruling on the evidence of Koerber, plaintiff's witness, in respect to the speed of the rear car, is objected to. He testified that, according to his best judgment, it was running about ten miles per hour. In the course of his cross-examination he also testified that he did not know how fast it was running. Defendant's counsel moved to strike out the evidence, that in his best judgment the car was running ten miles per hour, which motion the court overruled. We think that the witness, in saying he did not know, merely intended that he could not state exactly. But even though the court's ruling on defendant's motion was incorrect, we do not think defendant could have been prejudiced by it, because Vogt, defendant's witness, testified that the speed of the car was from 8 to 10 miles per hour.

Dr. Charles McDonald was the plaintiff's attending physician. He was called to attend her the day of the accident and attended her continuously from that time. He visited her one hundred times or more, and examined her for the last time about a week before the trial. He was called to attend the plaintiff on the recommendation of Dr. Mechan, defendant's witness, who testified that Dr. McDonald is a good man and all right. Dr. McDonald testified that, in his last examination of the plaintiff he had her squeeze his hands with both of hers as hard as she could, and found that his left hand, which she held in her right hand, was squeezed with a less degree of pressure than his right hand; also that he stuck a pin in her right arm till it bled, and she evinced no resistance whatever, whereas the left arm responded promptly to the pin pricks; also that he, using a tongue depressor, examined the posterior part of her throat, touching that part, and she did not gag, although the tendency of all patients is to gag under such circumstances. He based certain conclusions on these circumstances.

Counsel for appellant object to this evidence on the ground that it is based on subjective symptoms and self-serving actions of the plaintiff. We think the cases of City of Chicago v. McNally, 227 Ill. 14, and Eckels v. Muttschall, 230 ib. 462, a sufficient answer to the objection. In the last case the court say: "Dr. Ide had treated the plaintiff from the time of his injury and had examined him a few days before the trial. He testified fully to the physical conditions he found in the plaintiff immediately after the injury, also just prior to the trial. He stated that the plaintiff was lame, that he had curvature of the spine and degeneration of the spinal cord. The fact that the doctor, in arriving at his conclusions, was guided somewhat by what the plaintiff said to him, did not make his evidence incompetent and subject to be stricken out on the motion of the defendants."

The following question and answer occurred in the examination of the witness:

"Q. To what do you attribute the condition of nervous hysteria that this woman is suffering from, in view of your treatment and what you have learned of her case; to what physical condition do you attribute it?" "A. Due to the injury that she received in her head and the concussion and nervous shock at that time."

It was objected that this evidence was incompetent, on the ground that it was for the jury to decide whether the accident produced the condition described. The same objection to similar evidence was made in City of Chicago v. Didier, 227 Ill. 571, and this case is like that in that the manner of the injury is undisputed. The court say: "The reason given for permitting a properly qualified witness to give his opinion as to what did produce certain results or consequences, and not what might have produced them, is, that the fact to be established is what did cause the conditions found to exist. Where the determination of that question involves scientific knowledge or skill which is possessed only by those who have given the matter special study and with which the jurors and others engaged in the ordinary avocations of life are unfamiliar, a witness possessing the necessary qualifications may be asked for his opinion as to what did cause the conditions described."

It is contended that the sum awarded by the jury as damages, $2,500, is excessive. The evidence tends to prove that before the accident the plaintiff was a strong, healthy, hard-working woman, and that she earned nine to ten dollars per week by washing, and that ever since the accident she has been practically an invalid, and Dr. McDonald testified that the prospect or chance of her recovery from her ailments is very unfavorable. In view of the evidence as to the injury and the consequences of it to the plaintiff, we cannot sustain the contention that the damages are excessive.

The judgment will be affirmed.

*Affirmed.*